## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MERLIN PETROLEUM COMPANY, INC.,

     Plaintiff,

v.                                                    CASE NO:  8:16-CV-1000-T-30TBM

PEDRO JAVIER SARABIA and
CARLA CARLINA RAMIREZ EDWARDS,

     Defendants.

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon the parties' Motions for Partial Summary Judgment on the Issue of the Validity and Enforceability of the Subject Agreement (Dkts. 42, 44) and their respective Responses thereto (Dkts. 46, 47).[1]  The Court, upon review of the motions, responses, record evidence, and being otherwise advised in the premises, concludes that Plaintiff's motion should be granted and Defendants' motion should be denied.  As explained further below, the Court concludes, as a matter of law, that the November 9, 2011 agreement is valid and enforceable.

---

[1] On September 2, 2016, the Court, at the parties' request, bifurcated discovery and permitted the parties to conduct discovery only as to the issues of the validity and enforeability of the subject agreement and the terms of the subject agreement.  The Court further allowed the parties to file a motion for summary judgment on the issue of the subject agreement's validity and enforceability and directed the parties to file their motions by November 4, 2016 (Dkt. 39).

## **RELEVANT FACTS**

This is a breach of contract case regarding a November 9, 2011 agreement executed by Plaintiff Merlin Petroleum Company, Inc. ("Merlin") and Defendant Pedro Javier Sarabia.[2]    Merlin is a bunker brokerage firm specializing in meeting the marine fuel purchasing needs of ship owners.  MP Line, S.A. provided international maritime cargo transportation and logistics services.  Sarabia was MP Line's Commercial Director.  Merlin supplied bunkers to MP Line.  Sometime in 2010, MP Line filed for bankruptcy in Panama.  The record is undisputed that, as of November 9, 2011, Merlin was owed $1,772,867.65 by MP Line for bunkers Merlin had supplied to various vessels under charter to MP Line.

E-mails between Sarabia and Therese Ignozzi-Little, Merlin's President, reflect that Sarabia wanted to continue to have a relationship with Merlin, despite the debt MP Line owed to Merlin and despite MP Line's bankruptcy.  Specifically, e-mails contained in the record between Sarabia and Little in September, October, and November 2011, clearly show Sarabia's desire to enter into an agreement with Merlin to address the outstanding debt MP Line owed to Merlin and to continue a business relationship with Merlin.  The e-mails reflect that Sarabia was concerned about preserving his reputation in the industry and conducting future business in the industry.  For example, in an e-mail to Little dated October 24, 2011, Sarabia wrote:

---

[2] The issue of whether Sarabia's wife, who is also a Defendant in this case, is bound by the agreement is not addressed at this time because the parties' bifurcated discovery and briefing were limited to the issues of whether the agreement was supported by adequate consideration and whether the agreement contained terms that were certain and definite.

Despite the fact that we had to file for bankruptcy, and due to my personal will and only my will to pay as much as I can, I have proposed to you the operational agreement, that we can put in force in order to continue operating vessels around the world.  This can only happen with your good help as otherwise we will have to close the shop and start some other kind of business. You would be involved in deciding if we go for certain business or not, you will provide with the bunkers and same will be paid immediately after freight is received, and I will guarantee same personally, irrespective of the result of the voyage, however, you will get paid 35% of the net profit if same exceeds 100,000 USD and 25% if it is under 100,000 USD and same will be applied towards MP LINE debt.

As you know I need capital to continue working and I have have [sic] put my house and a piece of land for sale, once one of them is sold you will get a 20% of the net proceeds I get if I can have equity over 1 million and 15% if they are under 1 million.  Same again will be paid towards MP LINE bunkers.  On the land, it could fetch maybe 600,000 USD, if it does you will get 20% of same, if we get less then [sic] a 15% will be paid towards the bunkers.

The above can only happen if I am allowed to continue working by you and other small creditors and shipowners that we owe money to, as if we are not able to do so if it is impossible to do the above and same will have to be null and void.  We will have to make another company in order to avoid any possible problem with anybody trying to take some action against us.

. . .

I hope we can go forward with above.

(Dkt. 44-3).  Subsequently, on October 27, 2011, Sarabia sent an e-mail to Little stating, in

relevant part: "You obviously have other choices to finish me, and make sure that no one

does business with me, in which case I will regret it but there is nothing I can do, and if that

unfortunatelly [sic] happens no money will flow nowhere and probably will have to look for

an option, become a forwarder, a broker or a restauranteur, or will try to get a job." (Dkt. 43-

6).

The record also reflects that, prior to entering into the November 9, 2011 agreement, Merlin believed that it could take legal action to recover the $1,772,867.65 debt. In an e-mail dated September 29, 2011, from Little to Sarabia, Little states, in relevant part: "I have a very supportive and understanding husband who agrees that if we take legal action against you it would serve no justice. So, we are willing to move forward. We have some thoughts and await your plan." (Dkt. 44-3).

The e-mails between Little and Sarabia discuss the terms of the agreement. The e-mails also reflect that Sarabia planned on pledging his personal assets to repay the acknowledged debt. The agreement, attached as Exhibit 1 to Plaintiff's Amended Complaint, contains the terms discussed in the e-mails. Sarabia executed the agreement, personally, and Little executed the agreement "on behalf of Merlin Petroleum." The agreement states: "It is agreed that MP Line Panama is indebted to [Merlin] in the amount of $1,772,867.65 for bunkers supplied to various vessels under charter to MP Line Panama." "It is agreed that this amount will be repaid as follows . . ." The agreement then states the terms of repayment, which included payment from four sources as discussed in the e-mails: (1) a percentage of the proceeds from the sale of Sarabia's personal[3] property located in St. Petersburg, Florida;[4]

---

[3] The reference to "personal" property appears to be a scrivener's error to the extent that Sarabia testified during his deposition that the St. Petersburg property is real estate that Sarabia owned personally with his wife. (Sarabia deposition at 23).

[4] Notably, Sarabia's St. Petersburg, Florida property was listed as an asset of MP Line in 2011 on its balance sheet in the amount of $3,600,000.

(2) a percentage of proceeds from the sale of Sarabia and his wife's personal[5] property located in Mexico; (3) a percentage of the proceeds of a pending insurance claim that belonged to Sarabia; and (4) a percentage of future profits from a new company Sarabia intended to create.  Finally, the agreement states: "We agree and understand that the above does not in any way limit Merlin's rights to take alternate legal action if this debt is not satisfied."  (Dkt. 16-1).

Sarabia's motion argues that the agreement is invalid, as a matter of law, because it lacks consideration.  Sarabia also argues that there was no "meeting of the minds" and the agreement's terms are not sufficiently definite.  Merlin's motion argues that the agreement is valid and enforceable as a matter of law.  The Court now turns to the relevant law.

## STANDARD OF REVIEW

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action

---

[5] As stated in footnote 3 above, this reference to "personal" property appears to be a scrivener's error—the Mexico real estate was personally owned by Sarabia and his wife.

will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine

the evidence in the light most favorable to the non-movant and draw all justifiable inferences

in its favor.  *Id.* at 255.

## DISCUSSION

A party seeking to enforce a contract under Florida law must prove the existence of

a valid contract.  The elements of a valid contract require: (1) an offer; (2) acceptance of the

offer; (3) consideration; and (4) sufficient specification of the essential terms of the

agreement.  *See St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

With respect to the element of consideration: "A contract may be supported by any

act of the plaintiff from which the defendant derives a benefit, or it may be supported by any

labor, detriment, or inconvenience, however small, sustained by the plaintiff, if such act as

performed or inconvenience suffered is by the consent express or implied of defendant."

*Tampa N. R. Co. v. City of Tampa,* 140 So. 311, 313 (1932).  Notably, it is long-settled under

Florida law that refraining from enforcing a legal right constitutes valid consideration for a

contract.  *See City of Valparaiso v. Long,* 141 So. 2d 334, 335 (Fla. 1st DCA 1962) ("The

rule is well recognized that the forbearance to enforce a legal right is sufficient consideration

for a promise where such forbearance is requested."); *see also Citibank Int'l v. Mercogliano,*

574 So. 2d 1190, 1191 (Fla. 3d DCA 1991) ("It is well settled Florida law that forbearance

from pursuing a legal remedy, where the promisee has a bona fide belief that a viable legal

right exists, constitutes valid consideration for an agreement which benefits the promisor .

. . It is not required that the forbearance be provided for in express language or terms."); *Bara*

*v. Jones, et al.,* 400 So. 2d 88, 89 (Fla. 4th DCA 1981) (recognizing the principle that forbearance to sue is adequate consideration under "fundamental" principles of contract law).

The thrust of Defendants' argument is that the agreement did not include adequate consideration because Sarabia "gained no benefit from entering into the agreement, as he had no interest in MP Line and had previously told Little that Merlin would have to try to recoup the monies owed by MP Line through the bankruptcy proceedings." (Dkt. 44). The Court disagrees. The record is undisputed that Sarabia viewed the agreement as a way to save his reputation and to allow him to continue working in the shipping industry—these are clearly benefits that he gained. Moreover, the e-mails reflect that Merlin contemplated initiating a lawsuit against MP Line and Sarabia entered into the agreement, in part, to avoid litigation. Simply put, Sarabia's numerous e-mails show that he viewed the agreement as necessary to preserve his reputation, prevent a lawsuit against him, and in order to continue a business relationship, generally, in the shipping industry, and, specifically, with Merlin via a new company.[6] Any of these benefits, standing alone, qualify as adequate consideration.

Sarabia's arguments that there was no "meeting of the minds" and the agreement lacks uncertain and unclear terms are similarly belied by the e-mails between Sarabia and Little and the clear terms of the agreement itself. For example, the e-mails reveal that Sarabia and Little negotiated and ultimately agreed upon the material terms of the agreement. The agreement, itself, clearly delineates the material terms, like the four specific sources of

---

[6] Sarabia also testified that "if you have a good name in shipping, you can do business. If you don't have a good name, it's very difficult." (Sarabia Deposition at 9:12-16).

payment.  There is simply nothing unclear or uncertain about the agreement's terms and Sarabia's arguments to the contrary are without merit.

It is therefore **ORDERED** and **ADJUDGED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Dkt. 42) is granted.

2.      Defendants' Motion for Summary Judgment (Dkt. 44) is denied.

3.      Plaintiff's Motion for Leave to File Reply (Dkt. 48) is denied as moot.

4.      The parties shall proceed with discovery per the Court's Case Management and Scheduling Order (Dkt. 20).

**DONE** and **ORDERED** in Tampa, Florida on November 28, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

-8-